**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
402 W. BROADWAY, SUITE 2100
SAN DIEGO, CA 92101-3542
TELEPHONE: 619.234.6655
FACSIMILE: 619.234.3510

VICTOR A. VILAPLANA, CA BAR NO. 058535
VAVILAPLANA@FOLEY.COM
MATTHEW J. RIOPELLE, CA BAR NO. 260176
MRIOEPELLE@FOLEY.COM

ATTORNEYS FOR CREDITOR ALEXEJ LADONNIKOV AND PARTY-IN-INTERST DERMASTAR INTERNATIONAL, LLC

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>TRANSDEL PHARMACEUTICALS, INC.,<br><br>    DEBTOR. | CASE NO. **11-10497-PB11**<br><br>CHAPTER 11<br><br>**OPPOSITION TO DEBTOR'S MOTION TO SELL SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS AND ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS WITHOUT OVERBID**<br><br>DATE: JULY 18, 2011<br>TIME: 3:30 P.M.<br>DEPT: 4<br><br>HONORABLE PETER W. BOWIE |

Alexej Ladonnikov ("Ladonnikov"), the single largest creditor of Transdel Pharmaceuticals, Inc. (the "Debtor"), and DermaStar International, LLC ("DermaStar"), the proposed plan funder, hereby submit the following Opposition ("Opposition") to Debtor's Motion to Sell Substantially All Assets of the Estate Free and Clear of Liens, Claims and Interests and Assume Certain Executory Contracts Without Overbid ("Sale Motion").

## I.    INTRODUCTION

In the Sale Motion, the Debtor proposes to sell substantially all of its assets to Cardium Healthcare, Inc. ("Purchaser") in exchange for restricted stock in Cardium

Therapeutics, Inc. ("Cardium"), the Purchaser's parent company. Undisclosed in the Sale Motion is the fact that Cardium has lost over $81 million dollars since its incorporation and that Cardium expects to continue to lose money over the next five years. Under the timeline proposed in the Sale Motion, approval of the sale is sought *less than 30 days after* the Debtor filed its bankruptcy petition. However, it is unclear from the Sale Motion why the sale must be completed on an expedited basis, as the Debtor will not be harmed by a short delay to allow a plan to be negotiated with the Debtor. In addition to the rapid timeframe, the Debtor seeks to sell the assets through a private sale rather than the auction process typical in Section 363 sales. To further discourage overbidding, the Sale Motion seeks approval of a $500,000 break-up fee if the Court requires overbidding.

However, the Sale Motion is not a motion to sell at all, instead, it is a *sub rosa* plan that subjects the estate, its creditors and shareholders to considerable risk without any of the protections provided in Section 1129 of the Bankruptcy Code. As a result of his discussions with DermaStar, Ladonnikov has decided to withdraw his support of the Debtor's Sale Motion. The potential for a plan of reorganization for the Debtor provides the estate with a greater likelihood of recovery without the considerable risk of Cardium's unprofitable business and leveraged balance sheet.

## II. ARGUMENT

### A. The Sale Motion is No Longer Supported by the Debtor's Largest Creditor.

On June 29, 2011, Ladonnikov submitted a declaration in support of the Sale Motion ("Ladonnikov Decl."). As set forth in paragraph 3 of the Ladonnikov Decl., Ladonnikov was generally aware of the Debtor's efforts to "raise additional capital, obtain additional financing and sell its remaining assets." Moreover, Ladonnikov explained:

> I have reviewed the sale terms of Transdel's current proposed transaction with Cardium Therapeutics, Inc. Despite the fact that I prefer an "all cash" deal, I understand that this transaction is probably the last and only source of repayment to me of the funds Transdel owes me. Accordingly, I am in

2

SDCA_1882414.2

favor of the sale and a closing at the earliest possible time. Ladonnikov Decl. at ¶ 4.  Since the date of the Ladonnikov Decl., Ladonnikov has engaged in substantive discussions with DermaStar regarding alternative reorganization strategies.  As a result of these discussions, Ladonnikov has decided to withdraw his support for the Sale Motion and instead desires to work with DermaStar and the Debtor to craft a plan of reorganization that will result in a substantial recovery for the Debtor's creditors and existing equity holders.  Without the support of the Debtor's largest creditor and given the lack of justification for the proposed rush sale, the Sale Motion should be denied.  This Opposition is further supported by a number of the Debtor's shareholders. *See* Declaration of Michael Corwin In Support of Opposition, Ex. "A"; Declaration of Sergey Sablin In Support of Opposition.

### B. The Emergency Nature of the Sale is Unnecessary.

The Debtor filed its bankruptcy case on June 26, 2011 ("Petition Date").  On July 18, 2011, less than thirty days after the Petition Date, the Debtor is seeking to sell substantially all of its assets to the Purchaser.  However, there is no justification for the expedited sale.  As explained in the Sale Motion, the Debtor's lease expired on June 30, 2011 and the Debtor otherwise has no operations.  Thus, the Debtor's thin cash position is largely irrelevant.  Moreover, an expedited sale is unnecessary because the second Phase 3 trial requested by the FDA does not need to begin immediately.  If necessary to facilitate negotiations and confirmation of a plan, DermaStar is prepared to provide the Debtor with postpetition financing to pay necessary operating costs.  Therefore, the Sale Motion does not need to be approved on an expedited basis and the Debtor should be given time to negotiate a plan of reorganization.

### C. The Consideration is Vastly Overstated.

The consideration proposed in the Sale Motion is significantly overstated.  The Asset Purchase Agreement ("APA") and the Sale Motion state that the consideration for the Debtor's assets is $4 million.  However, this "valuation" of the consideration is not based in reality.  As explained in the Sale Motion, the Debtor will receive approximately

3

6 million shares of Cardium's common stock at closing and an additional 2 million shares of Cardium's common stock if the Debtor's product TDLP – 110 receives FDA registration. Despite currently trading at $0.28 per share and significant restrictions on the sale of these shares, the APA and Sale Motion "value" the shares of Cardium to be received by the Debtor at $0.50 per share. In fact, as explained in the Sale Motion, the initial 6 million shares cannot be liquidated for at least 180 days, and thereafter only 22,500 shares can be sold per day. Accordingly, the initial consideration received by the Debtor cannot be fully liquidated until at least 440 days after closing (180 day initial holding period followed by 260 days for liquidating 6 million shares in 22,500 share increments). Moreover, unlike the $3 million value ascribed to these initial shares in the Sale Motion, it is far more likely that these shares yield gross proceeds of no more than $1.68 million at most.

Critically, however, even the reduced estimated gross proceeds are, at best, highly risky. On November 26, 2010, NYSE AMEX LLC (the "<u>Exchange</u>") notified Cardium that it had fallen out of compliance with continued listing standards of the Exchange. *See* Declaration of Matthew J. Riopelle In Support of Opposition, Ex. "A". Specifically, Cardium is not in compliance with Exchange standards because it reported stockholders' equity of less than $6,000,000 and losses from continued operations in its <u>five most recent fiscal years ended December 31, 2009</u>. *Id*. If Cardium is not in compliance with the Exchange standards by August 26, 2011, the Exchange is "expected" to initiate delisting proceedings. *Id*. Moreover, as set forth in Cardium's 2010 Annual Report, Cardium's financial health is, at best, precarious:

> ***We have sustained operating losses to date and will likely continue to sustain losses as we seek to develop our products and product candidates.*** We expect these losses to be substantial because our product development and other costs, including significant amounts we expect to spend on development activities and clinical trials for our product candidates, cannot be offset by our limited revenues during our development stage. As of December 31, 2010, our accumulated deficit was approximately $81 million, and our cash and cash equivalents were approximately $6.6 million.

> To date, we have generated very limited revenues (mostly associated with our Innercool operations and a Tissue Repair Company grant, both of which have ended), and a large portion of our expenses are fixed, including expenses related to facilities, equipment, contractual commitments and personnel. ***As a result, we expect our net losses from operations to continue for at least the next five years.*** Our ability to generate additional revenues and potential to become profitable will depend largely on our ability, alone or with potential collaborators, to efficiently and successfully complete the development of our product candidates, successfully complete pre-clinical and clinical tests, obtain necessary regulatory approvals, and manufacture and market our products. There can be no assurance that any such events will occur or that we will ever become profitable. Even if we do achieve profitability, we cannot predict the level of such profitability. ***If we sustain losses over an extended period of time, we may be unable to continue our business.*** Our business prospects are difficult to evaluate because we are a development stage company.

*See* Riopelle Decl., Ex. "B" (emphasis added). Finally, according to Cardium's 10-Q filed with the SEC on May 16, 2011, Cardium had approximately $5 million in unrestricted cash as of March 31, 2011. *See id.*, Ex. "C". The 10-Q also disclosed that Cardium's "burn rate" is approximately $1.8 million per quarter. *Id*. Therefore, unless Cardium raises additional capital, Cardium will burn through its remaining cash by the end of the year, well before the Cardium stock will be fully liquidated by the Debtor. Thus, while the Debtor and its creditors wait to liquidate the Cardium stock, Cardium will continue to sustain losses, deplete its cash, and may be delisted from the Exchange. Accordingly, the proposed consideration is highly risky and unnecessarily exposes the Debtor's creditors to the risk of Cardium's failure.

      **D.**    **The Break-Up Fee is Excessive.**

The proposed break-up fee is excessive and will have the effect of chilling bidding and preventing the Debtor from negotiating a plan of reorganization with the DermaStar as the plan funder. In determining whether to approve a break-up fee, courts typically consider whether (1) there has been self-dealing between the parities; (2) the fee hampers,

rather than encourages bidding; and (3) whether the fee is unreasonable relative to the proposed purchase price. *In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992). Here, the Sale Motion seeks approval of the sale to the Purchaser without overbidding, but if overbidding is required by the Court, then the Purchaser requests approval of a $500,000 break up fee. This break-up fee is clearly intended to hamper bidding and is completely unreasonable relative to the proposed purchase price. In fact, based on the sheer magnitude of the break-up fee, the break-up fee is more like a liquidated damages clause. *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("Liquidated Damages cannot be paid as an administrative expense…").

Here, the purpose of the break-up fee is to discourage any potentially interested parties from interfering with the private sale negotiated prepetition between the Debtor and the Purchaser. Moreover, the break-up fee is in no way reasonably related to the proposed purchase price. Based on the "valuation" of the consideration by the Debtor and the Purchaser, the break-up fee is **12.5%** of the total consideration. However, based on the current value of Cardium's stock, the actual value of the consideration is only $2,240,000. Thus, the proposed break-up fee is actually **22.3%** of the total consideration. Break-up fees in excess of 10% of the total consideration, such as the fee proposed here, are not reasonable relative to the purchase price. *See In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colo. 1992) ("10% 'topping fee' sought here greatly exceeds the 1% to 2% fees found to be reasonable in the majority of cases approving such fees."); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("The total amount of the proposed break-up fee and expense reimbursement is less than 3% of the total purchase price. This falls within the range of what courts in this jurisdiction have found to be acceptable break-up fees."); *In re Sea Island Co.*, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. 2010) (3% "fee constitutes a fair and reasonable percentage of the proposed purchase price, given the range of fees approved within the Southern District of Georgia as well as within the State of Georgia."). Moreover, break-up fees, such as the one proposed by the Debtor in the Sale Motion, should not be approved where the break-up

fee is not "reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Integrated Resources, Inc.*, 147 B.R. at 662. As set forth in the Breslauer Decl., the total fees incurred by the Debtor for pre-bankruptcy legal fees, presumably including negotiation of the APA, was only $24,272. It is inconceivable that the Purchaser's fees and expenses are **20 times higher than the Debtor's.** Thus, the break-up fee should not be approved.

### E. The Sale Motion Constitutes a *Sub Rosa* Plan.

The Sale Motion effectively seeks a reorganization of the Debtor by motion (by vesting in the estate stock in Cardium) without the protections that creditors would otherwise receive under section 1129 of the Bankruptcy Code. This approach constitutes a *sub rosa* plan, and should be rejected. *See, e.g., In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (the debtor "should not be able to short circuit the requirements of chapter 11 for confirmation of a plan by establishing the terms of the plan sub rosa in connection with a sale of assets"). A sale is considered a *sub rosa* plan if it is essentially a "de facto plan" or "creeping plan of reorganization" that disposes of assets and pays creditors without a formal disclosure statement, written plan, ballot, or meaningful opportunity for creditors to participate in the process. *See, e.g., In re Dow Corning Corp.*, 192 B.R. 415 (Bankr. E.D. Mich. 1996); *In re Lion Capital Group*, 49 B.R. 163 (Bankr. S.D.N.Y. 1985).

Here, the Sale Motion is a de facto plan. All of the Debtor's assets are being sold to the Purchaser in exchange for stock in Cardium, the Purchaser's parent company. Moreover, as additional consideration, the Debtor will receive additional stock if its product obtains FDA approval. The restrictions on the stock will prevent the Debtor from liquidating the initial consideration for at least 440 days. As explained in Cardium's 2010 Annual Report, Cardium expects to lose money for at least the next five years. *See* Riopelle Decl., Ex. "B". Moreover, there is no explanation in the Sale Motion regarding Cardium's ability to fund the final Phase 3 trial or otherwise successfully bring the Debtor's product to market (which is necessary here where there is no cash

1 consideration). *See also id.*, Ex "C" (showing sufficient cash to support nine months of operations for Cardium before taking into account cash necessary for the second Phase 3). Thus, the Sale Motion will subject the Debtor's creditors and shareholders to the risk of Cardium's ability to bring the Debtor's product to market and Cardium's historically unprofitable operations without any opportunity to review a properly vetted disclosure statement or vote on the plan.

Accordingly, the Sale Motion constitutes a *sub rosa* plan and should be denied.

### F.  DermaStar and Ladonnikov are Prepared to Negotiate and Fund a Plan of Reorganization with the Debtor.

In contrast to the Sale Motion, which strips the estate of any upside of the successful commercialization of its product and yet subjects the estate to considerable risk, DermaStar and Ladonnikov (collectively, the "Plan Sponsors") are prepared to negotiate and, if an agreement can be reached, fund a plan of reorganization which will allow the Debtor's creditors and shareholders to realize immediate and future dividends. In short, the Plan Sponsors are prepared to provide immediate funds to pay administrative expenses and a portion of the Debtor's unsecured claims on confirmation; sufficient operating capital to complete the second Phase 3 trial; an experienced board and management team to oversee the final Phase 3 trial and, if approved, bring the product to market; and a commitment to bring the product to market. The Plan Sponsors, which include the Debtor's largest unsecured creditor, believe that a plan of reorganization will yield a greater recovery for the Debtor's creditors and shareholders without the additional risk of significant losses from Cardium's business lines with significant historical losses.

///
///
///
///
///
///

## III. <u>CONCLUSION</u>

For the foregoing reasons, Ladonnikov and DermaStar respectfully request that the Court either (1) deny the Sale Motion; or (2) deny the break-up fee and continue the hearing on the Sale Motion for 20 days to allow the Debtor and the Plan Sponsors to engage in negotiations to determine if a confirmable plan of reorganization can be proposed.

DATE:  JULY 11, 2011	FOLEY & LARDNER LLP
	VICTOR A. VILAPLANA
	MATTHEW J. RIOPELLE


	BY:	/S/ MATTHEW J. RIOPELLE
		MATTHEW J. RIOPELLE
		ATTORNEYS FOR ALEXEJ LADONNIKOV
		AND DERMASTAR INTERNATIONAL, LLC

9

SDCA_1882414.2