1  MICHAEL D. BRESLAUER [SBN 110259]
   mbreslauer@swsslaw.com
2  YOSINA M. LISSEBECK [SBN 201654]
   ylissebeck@swsslaw.com
3  SOLOMON WARD SEIDENWURM & SMITH, LLP
   401 B Street, Suite 1200
4  San Diego, California 92101
   Telephone: (619) 231-0303
5  Facsimile: (619) 231-4755

6  Proposed Attorneys for Debtor-In-Possession,
   Transdel Pharmaceuticals, Inc.

7

8              UNITED STATES BANKRUPTCY COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10 In re                              CASE NO. 11-10497-B11

11 TRANSDEL PHARMACEUTICALS, INC.,    Chapter 11

12                                    REPLY TO OPPOSITION TO DEBTOR'S
                                      MOTION TO SELL  SUBSTANTIALLY ALL
13              Debtor.               ASSETS OF THE ESTATE FREE AND CLEAR
                                      OF LIENS CLAIMS AND INTERESTS AND
14                                    ASSUME AND ASSIGN CERTAIN
                                      EXECUTORY CONTRACTS WITHOUT
15                                    OVERBID

16

17                                    Date: July 18, 2011
                                      Time:  3:30 p.m.
18                                    Dept: Four (4)

19                                    Honorable Peter W. Bowie

20        Debtor-In-Possession, Transdel Pharmaceuticals, Inc. (the "Debtor" or "Transdel")

21 respectfully submits its Reply to the oppositions filed by the United States Trustee (the

22 "UST") and Alexej Ladonnikov[1] (Ladonnikov") to the Debtor's motion to sell substantially all

23 assets of the estate free and clear of liens claims and interests and assume and assign certain

24 executory contracts without overbid (the "Motion") as follows:

25 _____

26 [1] The opposition was also filed on behalf of "party-in-interest" DermaStar International, LLC ("DermaStar").  A
      review of the Debtor's schedules reveals no entry referencing DermaStar, so it is unclear how they are
27    appropriately described as a party in interest in these proceedings. And while the list of 'parties in  interest'
      in Bankruptcy code section 1109 is non-exhaustive, DermaStar does not state anywhere in the Opposition
28    how it fits one of the enumerated categories.

P:00646574:60470.001

## I.

## THE OPPOSITIONS REFUSE TO ACCEPT REALITY AND OFFER NO SUBSTANCE TO CREDITORS AND SHAREHOLDERS.

Notice of the proposed sale to Cardium Healthcare, Inc. (the "Purchaser") was sent to over 50 creditors and approximately 500 shareholders  One creditor and shareholders who collectively control by their own numbers some 30% of the outstanding shares of the Company (and the UST) objected.  Through the Opposition, this small group (admittedly comprising a large portion of the Company's debt), wishes to roll the dice with both their own and all others' money.  Their objections fall into three broad categories.  These are (1) No urgency; (2) The Purchaser is weak; and (3) A better deal awaits through a Plan.

As will be shown below, these objections lack merit in context of this case, the Company's history and current circumstances.  The Opposition might have had some degree of credibility had it been accompanied by a real and tangible proposal.  Having set forth none within the time allotted, alluding to some unspecified 'plan' with unspecified financing on unspecified terms, all anyone has at this point is a real transaction on the one hand and "something" in the bush.  Prudence and sound business judgment dictates that the real transaction in hand, despite its flaws, should be pursued and approved.  The Motion should be granted.

Further, at the outset, the Oppositions are important as much for they do **not** contain as for what they do.  No party, inclusive of Ladonnikov (with his quasi-insider status, as discussed below), has taken exception with the Debtor's recital of its history of effort to find a solution to its lack of funding.  Common sense dictates that a higher price or better terms might have been obtained if more than one entity was interested in the Debtor and its assets. Sadly this is not the case.  But the record before the Court regarding the Debtor's efforts is **extensive, unambiguous: and uncontradicted.**   The Debtor searched high and wide, utilizing the services of professionals, to find a partner, an investor or a buyer. The search continued for over two years and in that time the Purchaser (through its parent, Cardium Therapeutics, Inc. ("Cardium"), having initially passed on the opportunity, came back to the

1    deal and proposed to acquire the Company's assets.  There were no other interested parties.

2    As detailed in Mr Lomoro's reply declaration, Ladonnikov has been on the "inside" of

3    the Debtor's affairs, with direct communication with officers and directors regarding the

4    debtor's financial condition.  Ladonnikov  submitted a declaration in support of the deal

5    based in no small measure on his belief at the time that the transaction with the Purchaser

6    represented the last and only hope of recovering payment.  This was no doubt based on his

7    extensive knowledge of the effort undertaken to try and find a buyer, investor or a partner for

8    Transdel and its assets.  He knew that the Purchaser was the only and last chance to recover

9    value.  That's why he supported the sale.  Unfortunately for the 98% of the creditor body (at

10    least in number) who stand to obtain recovery on their claims, he's now apparently

11    embarking on a  risky path with their money, as well as his own.

12    **II.**

13    **URGENCY IS DICTATED BY THE PURCHASER AND REMAINING LIFE OF THE DEBTOR'S**

14    **PROTECTABLE INTELLECTUAL PROPERTY**

15    It is clear that the Purchaser will not await the outcome of a plan, even if it were to

16    contain provisions for the sale of the Debtor's assets.  The Debtor is saddled with the Buyer

17    and the terms it has, subject to court approval of the sale.  While some of those terms might

18    generate Court objection, there are no terms binding the Purchaser to the deal other than

19    those in the APA.  Since the APA contains deadlines of July 20 for approval and July 31 for

20    closing, the Purchaser would seem to be able to 'walk' from the deal if such terms are not

21    met, just as if the purchase price or the 'currency' used for its payment were not approved.

22    And all indications are that the Purchaser will 'walk' away from the deal if it is not approved.

23    As set forth in the declarations of John Lomoro and Christopher Reinhard, if the Court does

24    not approve the proposed transaction, the Purchase is uninterested in proceeding further.

25    Despite argument to the contrary, this does create actual urgency and exigency if the

26    Debtor is to keep intact the only deal it has found after over two years of searching.  The

27    Opposition's argument assumes the conclusion.  They assert that because the Debtor has

28    very few ongoing expenses (which is true) and is currently without space and has only two

1     employees (also true) that there should be no rush to move forward to a sale.  This is untrue.

2     From the perspective of those charged with the duty to preserve and maximize value of this

3     knife-edged insolvent company, taking a deal which would, if reasonable conditions are

4     met, provide cash to pay creditors claims and potentially provide a shareholder recovery is

5     not only prudent, their failure to snap at it would have no doubt been met with a chorus of

6     claims of misfeasance.  This is apparent and true when the alternative is nothing.  It is also

7     apparent in light of the context in which the Debtor finds itself after scouring the market for

8     over two years.  As detailed in Mr. Lomoro's reply declaration, at least one of the reasons for

9     the lack of outside interest is the looming expiry of the Company's patent in 2016.    With

10     expensive $8-10 Million) Phase 3 clinical trials required which take many months to perform

11     (and an FDA review thereafter), potential investors or lenders have looked at the 2016

12     expiration date of the Company's patent as a material negative factor weighing on a decision

13     whether to invest.

14        Accordingly, for Transdel, with utterly no options, and despite the absence of current

15     cash needs, **exigency is present** where demanded by the buyer for a deal which provides the

16     only glimmer of recovery for creditors.

17                                          **III.**

18        **THE PROPOSED SALE IS NOT WITHOUT RISK, BUT SHOULD BE APPROVED**

19        The Opposition offers a news flash:  Biotech companies lose money!!  The statement

20     of Cardium's cumulative losses is a red herring.  While the Debtor's motion is not a forum

21     on the vagaries of the biotechnology market (many companies with substantial market

22     capitalizations have losses as they develop new drugs and therapies), Cardium is actively

23     traded on the NYSE and AMEX and approximately 250,000 shares trade every day.  The

24     Company has a market capitalization of approximately $25 Million

25        As set froth in the declaration of Christopher Reinhard, Cardium has worked with the

26     exchange to address issues raised to them, and is working under an approved plan to bring

27     the company into compliance.  There is no reason (nor is one suggested) that this process

28     will not result in satisfactory resolution of the issues Cardium faces.  Moreover, Cardium's

1   track record has evidenced its ability to raise sufficient capital and does not support the

2   extreme view embraced and pushed by the Opposition.

3       Most importantly, risk must be assessed in a relative atmosphere.  What is before the

4   Court is an existing transaction.  What is exposed in the Opposition is an expression of

5   interest to negotiate.  (Opposition, page 8, line 10-13).  Risk is inherent in the proposed sale

6   to the Purchaser, but compared to a 'let's talk" suggestion in the Opposition, the choice is

7   still clear.  The Debtor should take the deal it has.

8                                   IV.

9   **THE SALE OUTSIDE A PLAN IS APPROPRIATE HERE AND THERE IS NO OTHER**

10                              **ALTERNATIVE**

11      Bankruptcy courts are frequently faced with the uneasy decision of whether to side

12  with the deal in hand rather than the possible and proverbial "two in the bush".[2]  Given the

13  fragile and uncertain terrain of a bankruptcy estate, that analysis usually favors the deal in

14  hand, notwithstanding the absence of a plan, as long as the requirements for such a sale, as

15  here, have been met.  Committee of Equity Sec. Holders v. Lionel Corp., (In re Lionel Corp.),

16  722 F.2d 1063, 1070 (2d Cir. 1983).  It is certainly true that a sale of all the debtor's assets

17  can properly occur outside a plan.  Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th

18  Cir. 1991).  See also, In re WHET, Inc. 12 B.R. 743, 750 (Bankr. Mass. 1981).

19      The court in In re WHET commented on the circumstances where it might be

20  inappropriate to sell substantially the assets of the Debtor outside a plan and noted that such

21  circumstances might include where the assets have not been properly exposed to market or

22  where the sale has been arranged by the Debtor who is to have an interest in the purchasing

23  entity. Id. at 751.  And while that list is certainly not exhaustive, here, in sharp contrast,

24  there has been extensive pre-bankruptcy marketing and the proposed transaction is 'whistle-

25  clean' with respect to money and connections between buyer and seller.    Except for

26  _____

27  [2] "The old adage that a bird in the hand is worth two in the bush frequently comes into play in the
        administration of estates in bankruptcy." In re Bicoastal Corp. 164 B.R. 1009, 1010 (Bankr. M.D. Fla, 1993)

28

1 transitional consulting agreements at hourly rates, there is utterly no connection between the

2 Purchaser and the Debtor – at any level.

3      The lack of any description of a proposed 'plan' underscores the risk of letting this

4 transaction fall by the boards, letting the deal in hand slip away.  What Ladonnikov wants is

5 not so much to let the one go in lieu of another "in the bush".  Rather, he wants to "let the

6 bird in the hand go and go out and look for a bush with some birds in it."[3]  The absence of

7 any – any – facts showing the terms (let alone the *substance or capacity*) of an alternative

8 transaction, make the arguments of the necessity of a proposed plan ring hollow.

9 Ladonnikov is not wanting for information.  Given his quasi insider status and the nature of

10 his obligation as akin more to an equity investment rather than a pure loan or indebtedness

11 held by trade creditor, the court should be wary of his advocacy to dictate a result on behalf

12 of the rank and file.  Given the lack of any interest over the past two years, the company's

13 directors believed (and still believe) that a deal which offers a reasonable expectation of full

14 repayment is preferable to no deal at all.  As of this time, despite Ladonnikov's Opposition,

15 there is no other deal.

16      It's no surprise that bettors would like a one-horse race, provided that it's your horse

17 running.  It's also not surprising that the Purchaser here has attempted to dictate terms which

18 make the cost to another bidder (or to the estate) more expensive.  Yes, there are significant

19 'break-up' and 'topping' fees.  And while those terms are embodied in the APA, they are yet

20 to be approved.  Accordingly, they are largely irrelevant if there is no other bidder for the

21 assets.  Before the court is a sole bid, and nothing in the Ladonnikov Opposition states

22 otherwise.  Rather, there is the suggestion of the possibility of negotiation toward a bid.

23 While it probably can be assumed that Ladonnikov has resources (he parted with $1 Million

24 in cash to the Debtor in 2010), who is "DermaStar"?[4]  And why should their status as

25

26    [3] In re Global Crossing, 295 B.R. 726, 746 (Bankr. S.D.N.Y. 2003)
   [4] There is no reference in the Opposition of any background or financial information about DermaStar.  A

27       search of the web reveals a U.K. Company called DermaStar, Ltd. (http://www.acnestar.co.uk/who.html)
      selling "home based" acne treatments, but no reference to the company's financial status.

28

1  "prepared to negotiate" be of any interest here?  This smells more like a play to substitute

2  Ladonnikov/DermaStar as the one horse running, and here to the material detriment of the

3  creditor body.

4                                           V.

5                                     CONCLUSION

6         The Debtor wishes the facts were different and this was an all cash deal with several

7  strong potential stalking horses from which it might choose for the sale.  But after itself

8  stalking the terrain for over two years with the help of investment bankers, the Debtor

9  exercised its business judgment and took the only deal that it had.  The objections miss the

10  point of the exigency and the need for this deal – the only deal – to be consummated at

11  once so as not to lose the reasonable possibility of payment of creditors' claims and the

12  return of some dividend to shareholders.  Mr. Ladonnikov's change of mind should not

13  distract the Court from approval of the proposed transaction.  The Debtor's Motion should

14  be granted.

15   DATED: July 14, 2011               Respectfully submitted,

16                                     SOLOMON WARD SEIDENWURM & SMITH, LLP

17

18                                     By: /s/ Michael D. Breslauer
19                                          MICHAEL D. BRESLAUER
                                            Attorneys for Debtor-In-Possession, Transdel
20                                          Pharmaceuticals, Inc.

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, Wendy A. Yones, declare as follows:

I am employed in the County of San Diego, State of California; I am over the age of eighteen years and am not a party to this action; my business address is Solomon Ward Seidenwurm & Smith, LLP, 401 B Street, Suite 1200, San Diego, CA 92101, in said County and State. On **July 14, 2011**, I served the following document(s):

**REPLY TO OPPOSITION TO DEBTOR'S MOTION TO SELL SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS CLAIMS AND INTERESTS AND ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS WITHOUT OVERBID;**

**DECLARATION OF JOHN LOMORO IN REPLY TO OPPOSITION TO DEBTOR'S MOTION TO SELL SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS CLAIMS AND INTERESTS AND ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS WITHOUT OVERBID; and**

**DECLARATION OF CHRISTOPHER J. REINHARD IN REPLY TO OPPOSITION TO DEBTOR'S MOTION TO SELL SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS CLAIMS AND INTERESTS AND ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS WITHOUT OVERBID**

on each of the interested parties stated on the attached service list.

**I.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**: Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 14, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the e-mail address(es) indicated below:

> **United States Trustee - ustp.region15@usdoj.gov; shannon.m.vencill@usdoj.gov; david.a.ortiz@usdoj.gov; tiffany.l.carroll@usdoj.gov**
> **Matthew J. Riopelle, Esq. - mriopelle@foley.com**

☐    Service information continued on attached page

**II.    SERVED BY U.S. MAIL OR OVERNIGHT MAIL:**  On **July 14, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows.

☐    Service information continued on attached page

**III.    SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR E-MAIL:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 14, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or e-mail as follows.

1    ☒        Service information continued on attached page

2

3    I declare under penalty of perjury under the laws of the United States of America that the
     foregoing is true and correct.

4

5    Dated:   July 14, 2011                    By: /s/ Wendy A. Yones
                                                    WENDY A. YONES

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**SERVICE LIST**

2

| 3

**VIA NEF & EMAIL**
David A. Ortiz
Office of the United States Trustee
Southern District of California
402 West Broadway, Suite 600
San Diego, CA 92101-8511
david.a.ortiz@usdoj.gov

**VIA NEF & EMAIL**
Victor A. Vilaplana, Esq.
Matthew J. Riopelle, Esq.
Foley & Lardner LLP
402 West Broadway, Suite 2100
San Diego, CA 92101-3542
vvilaplana@foley.com
mriopelle@foley.com

**VIA EMAIL**
Sandra Lavigna
US Securities & Exchange Commission
5670 Wilshire Blvd 11th Floor
Los Angeles, CA 90036-3648
lavignas@sec.gov

**VIA EMAIL**
Kathryn M.S. Catherwood, Esq.
Duane Morris LLP
101 West Broadway, Suite 900
San Diego, CA 92101-8285
KMCatherwood@duanemorris.com

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28